## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| CHRISTIE JO BERKSETH-ROJAS DDS, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>        v.<br><br>ASPEN AMERICAN INSURANCE COMPANY,<br><br>                                        Defendant. | Civil Action No. 20-cv-00948-D<br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff Christie Jo Berkseth-Rojas DDS, individually and on behalf of the other members of the below-defined nationwide classes (collectively, the "Class"), brings this class action against Defendant Aspen American Insurance Company ("Aspen"), and in support thereof states the following:

## I.        NATURE OF THE ACTION

1.        Plaintiff Christie Jo Berkseth-Rojas DDS delivers excellent dental care to patients at Rojas Family Dental in Minneapolis, Minnesota.  Dr. Berkseth-Rojas strives to be particularly empathetic to her patients after having endured an extraordinary amount of dental work before she was 21 years old.   Dr. Berkseth-Rojas has provided dental care to elderly and special needs patients, has spent many years working in various community clinics, and believes that it is important for her to provide dental care to underserved communities.  At Rojas Family Dental, Dr. Berkseth-Rojas provides affordable, convenient, high-quality dentistry to the families of the Twin Cities.

2.      To protect her dental practice in the event that she suddenly had to suspend operations for reasons outside of her control, or in order to prevent further property damage, Plaintiff purchased insurance coverage from Aspen American Insurance Company, including Practice Income and other coverage, as set forth in Aspen's Building, Blanket Dental Practice Personal Property and Income Coverage Form (Form ASPDTPR001 0219) ("Income Coverage Form").

3.      Aspen's Income Coverage Form provides "Practice Income" coverage, in which Aspen promises to pay for loss due to the necessary suspension of practice following damage to property, subject to a "Valued Daily Limit."

4.      Aspen's Income Coverage Form also provides "Civil Authority" coverage, in which Aspen promises to pay for loss of practice income caused by the action of a civil authority that prohibits access to the insured premises.

5.      Aspen's Income Coverage Form also provides "Extra Expense" coverage, in which Aspen promises to pay the expense incurred to restore normal practice services.

6.      Aspen's Income Coverage Form, under a section entitled "Duties in the Event of Damage" mandates that Aspen's insured must "[t]ake all reasonable steps to protect the covered property from further damage by a covered cause of loss" and keep a record of "expenses for emergency and temporary repairs, for consideration in the settlement of the claim."  This type of coverage has historically been known as "sue and labor" coverage or a "sue and labor" provision, and property policies have long provided coverage for these types of expenses.

7.      Unlike many policies that provide Practice Income or Business Income (also referred to as "business interruption") coverage, Aspen's Income Coverage Form does not include, and is not subject to, any exclusion for losses caused by viruses or communicable diseases.

2

8.     At least three members of Rojas Family Dental staff have contracted COVID-19 while working on covered property. It is thus an absolute certainty that covered property has been infiltrated and contaminated by COVID-19 by those three persons—and likely numerous others. The virus was there. The virus was harmful. Its adhesion to the air in the property and property altered the property and made it harmful. Plaintiff thus has been forced to suspend or reducer her practice due to COVID-19 and the resultant Executive Orders issued by the Governor of Minnesota that non-emergency or elective dental care that requires Personal Protective Equipment ("PPE") be postponed indefinitely (the "Executive Orders"), as well as in order to take necessary steps to prevent further damage and minimize the suspension of business and continue operations.

9.     Make no mistake, covered property of Rojas Family Dental has been contaminated and continues to be contaminated by COVID-19. Plaintiffs hereby allege as true and will present expert testimony of the following:

a.     Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is a betacoronavirus that is genetically related to several other zoonotic coronaviruses, including SARS-CoV-1, the etiological agent of SARS. SARS-CoV-2 causes coronavirus disease 2019 (COVID-19) in humans. SARS-CoV-2 has glycoprotein "spikes" that are able to bind to human angiotensin converting enzyme 2 (ACE-2) receptors, which is present on human respiratory epithelial cells. After binding to ACE-2, the virus is able to enter the cells and make copies of itself, which are then released. These released infectious viral particles are then expelled in respiratory secretions as respiratory droplets into a multiphase, turbulent gas cloud during breathing, coughing, sneezing, talking, and singing. There are large and small respiratory droplets within the cloud. Large respiratory droplets can

infect other people either directly, through direct contact with respiratory mucosal surfaces, or indirectly, by contaminating surfaces which are then touched by another person who subsequently touches her or his mouth, nose, or eyes. The small droplets remain in the air as an aerosol, which can remain suspended in the air for hours, travel prolonged distances indoors along air currents induced by the HVAC system, and travel from room to room, infecting people directly through contact with, and inhalation of, the aerosol. Particles from the aerosol can also contaminate surfaces.

b. Because SARS-Co-V-2 spread is logarithmic, a key purpose of government closure orders for non-essential medical procedures that require personal protective equipment (PPE) is to prevent the spread of SARS-Co-V-2. In the absence of closure, more likely than not there will be people infected with SARS-Co-V-2 present on a premise, causing contamination of air and physical surfaces with infectious SARS-Co-V-2 particles, leading to virus transmission and additional cases of COVID-19. For every case of COVID-19 prevented by closure orders, up to six additional cases will be prevented, resulting in greater preservation of PPE than saved directly by the closures order alone.

c. The virus is indirectly transmitted when a host touches a contaminated object or surface that is contaminated with the SAR-CoV-2 virus (i.e., fomite transmission). The virus can survive on hard and soft surfaces for a period of time ranging from a few hours to a few days.

d. Aerosol transmission, particularly during aerosol generating procedures, is believed to be a common mode of transmission in healthcare settings.

Although aerosols can be generated through simple breathing, many common procedures performed and devices used in dentist offices are aerosol generating procedures, including, but not limited to, ultrasonic scaler, high-speed dental handpiece, air/water syringe, air polishing, and air abrasion. These devices expel oral secretions into the air as an aerosol. If a person is infected with SARS-CoV-2, whether symptomatic or asymptomatic, and undergoes a dental procedure, infectious viral particles will be aerosolized into the air. Infection clusters suggest that aerosol, droplet and fomite transmission explain SARS-CoV-2 transmission amongst humans.

e.   Nonetheless, the virus, while imperceptible to the human eye without enhancement, is undeniably present in the air, and on objects and surfaces where infected humans congregate. The object and surface and space are, essentially, rendered useless, in that they should not be utilized while virus is present.

f.   The virus cannot be observed by the human eye without enhancement. No one can see the virus in the air, on one's hands, or on a surface. This, of course, makes it difficult to eliminate the virus, or eradicate its transmission, from air or surfaces. The presence of the virus is only observed through the infection rate.

g.   In a healthcare setting, such as a dentist office, merely cleaning surfaces may reduce but does not altogether eliminate the risk of transmission amongst office staff and patients. There may be surfaces with residual infectious virus, and aerosolized infectious particles. In other words,

disinfection may temporarily eliminate a virus that was present prior to disinfection; however, a space may remain contaminated if an aerosol is present, and immediately become contaminated thereafter if another infected person is present in the area. Further, the challenges of keeping a dentist office free from virus contamination extend beyond disinfection because people will necessarily need to remove their masks for dental care, and thus, infected people will continuously emit infectious viral particles to others.

h.  The presence of the virus, whether circulating or stagnant, has changed the object, surface or premises, in that it has become dangerous to handle and/or enter, and cannot be used. Its use can only be restored with remedial action and sufficient time for the contaminated air to be evacuated, as suggested by the CDC and other infectious disease experts.

i.  The virus, observable only through microscopy and reflected by the public transmission rates, does physically exist and will survive in the air and on hard and soft surfaces. The virus can remain viable and infectious in aerosols for hours and on surfaces up to days. The virus may be inhaled from aerosols or spread to hands from a contaminated surface and then to the nose or mouth, causing infection. Notably, clearance of aerosols or disinfection of a contaminated surface is temporary and will easily become contaminated again when the virus is reintroduced by another infected person, and this contamination will provide a constant modality for infection to people.

j.  The virus' presence in a community, evidenced by infection rates, makes it more probably true than not, that live virus has been transferred in the air and to objects and surfaces. When aerosolized or an object or surface contains live virus, the virus is physically present in the air and on surfaces and objects, but imperceptible to the human eye. Nevertheless, the air, objects and surfaces should not be used. The transmission of the virus can occur through breathing, aerosol generating procedures, or touching surfaces or objects contaminated with virus from an infected person.

k.  Aerosol, droplet, and fomite transmission are the basis for masking, eye protection, use of gowns and gloves in the healthcare setting, social distancing, hand-washing, stay-at-home orders, home-shelter orders, distance learning, reduced capacity and/or occupancy limits, and other measures implemented in various executive orders, including the order entered in the State of Minnesota. The virus is physically present in the community, including in the air and on objects and surfaces. Aerosol and fomite transmission are real, and due to constant recontamination of air and surface areas, it is simply impossible to entirely eradicate the virus from indoor spaces and such surfaces if there continue to be unmasked people in the area.

l.  Reducing capacity in public settings is one way to reduce the presence of virus on objects and surfaces and, therefore, reduce the risk of transmission, especially during times of rising infection rates.  Wearing masks reduces, but does not eliminate, the likelihood of virus being aerosolized and transferred to objects and hard surfaces. However, in a dentist office setting,

7

where masks cannot be worn during the exam and dental procedures, the likelihood of virus being aerosolized and transferred to objects and surfaces is increased. This is true even if patients and staff are asymptomatic.

m.  Even with cleaning and disinfecting, the presence of virus on objects and surfaces, though reduced, cannot be reliably eliminated because these surfaces will continue to become contaminated as people spread the virus throughout their dental exams (i.e., breathing and undergoing aerosol generating procedures). The only way to ensure the absence of virus on objects and surfaces is to prevent access to an environment, especially an indoor environment with full capacity.

10.  Due to COVID-19 and the Executive Orders, Plaintiff has suffered "direct physical loss of or damage" to her property—under the plain and ordinary meaning of that term—because COVID-19 made the property unusable in the way that it had been used before COVID-19.

11.  Instead of being able to fill her family dental office with employees and customers, Plaintiff was required to drastically reduce operations at her office, and even to close entirely. To do anything else would lead to the emergence or reemergence of COVID-19 at the property. Until COVID-19 was brought slightly under control, even limited use of Plaintiff's family dental office was not possible.

12.  This loss is "direct"—Plaintiff is not asking Aspen to reimburse her after someone obtained a judgment against her for getting them sick.  That might be an indirect loss.  Plaintiff is asking Defendant to pay for her loss of business income occasioned directly by being unable to use her property.  Further, COVID-19 was not only a substantial factor in causing the loss, it also was the predominant or immediate factor in causing the loss or damage:  COVID-19 was close in proximity to the loss or damage, such that any ordinary person would think that the loss or damage

was in the zone of danger of COVID-19, and as a matter of ordinary speech and usage an ordinary person would understand and say that COVID-19 caused the loss or damage. Plaintiff will present expert testimony to a jury to establish the proximity in distance of the virus and the common understanding of the cause of the virus, which will establish to a jury that the loss or damage was direct—even under the strictest test on the meaning of "direct."

13.     This loss is physical. COVID-19 structurally altered the surfaces of covered property and ambient air within covered property. Plaintiff will present expert chemical testimony to show the structural alteration to the ambient air within and surfaces of covered property. Plaintiff is unable to use the interior spaces of her dental office in the manner in which she had previously used those spaces, as Plaintiff will show through the facts and expert testimony on safe occupancy of physical space. The probability of illness prevents the use of property in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[1]

14.     This loss is a loss. It is the loss of functionality of the space for business purposes. It is the diminishment of the physical space in the building. What once could hold many now can safely hold only a few, or at certain times, none at all. It is the injury and structural change to ambient air within covered property and the surfaces of covered property.

15.     The impairment of the business function is also damage to the dental office.

---

[1] Note, however, that Plaintiff is not seeking recovery for her loss of use. Plaintiff is seeking coverage for her loss of business income. Here's an example that drives home the difference—some law firms have been unable to use their office space because of COVID-19, but nevertheless the law firms' business income has increased and they thus have faced no loss of business income. A claim by such a law firm for not being able to use its office space would be a "loss of use" claim. The law firm would have no loss of business income claim. Here, Plaintiff's business has decreased because of the impairment of her dental office facilities, and Plaintiff is seeking the loss of business income under the business interruption coverage of her property insurance policy.

16.     Insurers around the country, like Aspen, are now wanting federal and state judges to interpret the words "direct physical loss of or damage," but those words need no interpretation. What insurers want is for courts to change the meaning of those terms—instead of just letting a jury apply the facts of the case to these ordinary words and reach a verdict in the same way a jury would reach a verdict if it were called upon to answer whether a person was injured, or property was damaged.

17.     Upon information and belief, Aspen has, on a widescale and uniform basis, refused to pay its insureds under its Practice Income, Civil Authority, Extra Expense, and Sue and Labor coverages for losses suffered due to COVID-19, any executive orders by civil authorities that have required the necessary suspension of practice, and any efforts to prevent further property damage or to minimize the suspension of practice and continue operations.  Indeed, Aspen has denied Plaintiff's claim under her Aspen policy.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different states, and because (a) the Class consists of at least 100 members, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) no relevant exceptions apply to this claim.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this district and a substantial portion of the acts and conduct giving rise to the claims occurred within the District.

## III.     THE PARTIES

*Plaintiff*

20.     Christie Jo Berkseth-Rojas DDS provides dental care to patients from the Twin Cities at Rojas Family Dental in Minneapolis, Minnesota.

10

*Defendant*

21.     Aspen American Insurance Company is an admitted insurance carrier incorporated and domiciled in the State of Texas, with its principal place of business in Rocky Hill, Connecticut.

## IV.     <u>FACTUAL BACKGROUND</u>

### A.     *The Income Coverage Form Protecting Plaintiff*

22.     In return for the payment of a premium, Aspen issued Policy No. D006449-03 to Christie Jo Berkseth-Rojas DDS for a policy period of December 6, 2019 to December 6, 2020, including a Building, Blanket Dental Practice Personal Property and Income Coverage Form. Policy No. D006449-03 is available at Dkt. 17.   Dr. Berkseth-Rojas has performed all of her obligations under Policy No. D006449-03, including the payment of premiums.   The "Covered Property," with respect to the Income Coverage Form, is 3455 4th Avenue South, Minneapolis, Minnesota, 55408.

23.     Plaintiff's Income Coverage Form, included within the policy at Dkt. 17, includes Practice Income, Civil Authority, Extra Expense, and Sue and Labor coverages.

24.     In many parts of the world, property insurance is sold on a specific peril basis.  Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.).  Most property policies sold in the United States, however, including those sold by Aspen, are all-risk property damage policies.  These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.  In the Income Coverage Form provided to Plaintiff, Aspen agreed to "pay for all direct physical damage" to the Covered Property "caused by or resulting from any covered cause of loss," and defined  "Covered Causes of Loss" as "ALL RISK OF DIRECT PHYSICAL LOSS except as excluded or limited" therein.

25.     In the Income Coverage Form, Aspen did not exclude or limit coverage for losses from viruses.

11

26.    Losses due to COVID-19 are a Covered Cause of Loss under Aspen policies with the Income Coverage Form.

27.    In the Income Coverage Form, Aspen agreed to pay for its insureds' actual loss of Practice Income sustained due to the necessary suspension of practice during the "period of restoration" caused by direct physical damage, subject to a Valued Daily Limit. Aspen agreed to "pay for loss of practice income that occurs within 12 consecutive months after the date of direct physical damage."

28.    "Practice Income" means net income (or loss) before tax that Plaintiff would have earned and "continuing normal operating expenses, including payroll."

29.    The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006.  When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement (ISO Circular  LI-CF-2006-175) to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. … Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

30.    The presence of virus or disease has resulted in physical damage to property in that manner in this case, including structural alteration of the ambient air and the surfaces of the property, along with a loss of functionality and the diminishment of functional space.

31.     In the Income Coverage Form, Aspen also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" "due to damage by a covered cause of loss" to the Covered Property.

32.     "Extra Expense" means expenses necessarily incurred by Plaintiff "during the period of restoration to continue normal services and operations."

33.     Aspen also agreed to pay "the actual loss of practice income" that Plaintiff sustains "caused by action of civil authority that prohibits access to" the Covered Property "due to the direct physical damage to property," other than at the Covered Property, "caused by or resulting from any covered cause of loss."

34.     Aspen's Income Coverage Form, under a section entitled "Duties in the Event of Damage" mandates that Aspen's insured must "[t]ake all reasonable steps to protect the covered property from further damage by a covered cause of loss" and keep a record of "expenses for emergency and temporary repairs, for consideration in the settlement of the claim."

35.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Practice Income, Extra Expense, Civil Authority, and Sue and Labor provisions of the Aspen policy.

36.     Indeed, many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders. *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[2] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103 at 1 (March 25, 2020)[3] (recognizing the "actions taken to prevent such spread [of COVID-19] have led to property loss

---

[2] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf

[3] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf

and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)[4] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[5] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[6] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[7] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[8] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[9] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[10] (in addition to COVID-19's creation of a

---

[4] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf

[5] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf

[6] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order

[7] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf

[8] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF

[9] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

[10] https://www.hillsboroughcounty.org/library/hillsborough/mediacenter/documents/administrator/epg/saferathomeorder.pdf

"dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020)[11] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[12] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[13] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property"); and State of Nevada Declaration of Emergency Directive 016 at 1 (Apr. 29, 2020)[14]  (noting "ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time renders some property unusable and contributes to contamination, damage, and property loss").

**B.      *The Covered Cause of Loss***

37.     Unlike SARS-CoV-2, some viruses do not infect humans, or cannot be transmitted from human to human.

---

[11] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620

[12] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf

[13] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL

[14] https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/

38.     The coronavirus is transmitted in several ways, including via human-to-human contact, airborne viral particles in ambient air, and touching surfaces or objects. For example, when an uninfected person touches a surface containing the coronavirus, the uninfected person  transmits the coronavirus to another person, either by touching and contaminating a second surface, which is subsequently touched by that other person, or more directly by transmitting the coronavirus to another person. The coronavirus spreads easily from person to person and person to surface or object, primarily through small, physical droplets expelled from the nose or mouth when an infected person speaks, yells, sings, coughs, or sneezes. According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing droplets that can span as far as 23 to 27 feet.[15]

39.     According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days. Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

---

[15] See https://jamanetwork.com/journals/jama/fullarticle/2763852.

40.     Physical droplets containing the coronavirus  land on objects and surfaces. After landing on objects and surfaces, the coronavirus can remain present and dangerous for periods ranging from hours to many days.

41.     According to the WHO, people can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth. This mode of transmission—indirect transmission via objects and surfaces—is known as "fomite transmission." As the WHO has noted, fomite transmission is "a likely mode of transmission for SARS-CoV-2" because studies have consistently confirmed the existence of virus-laden droplets on objects and surfaces "in the vicinity of infected cases," and because it is well known that other coronaviruses can be transmitted via fomite transmission.[16]

42.     A study of a COVID-19 outbreak published in the CDC's Emerging Infectious Diseases journal identified indirect transmission via objects such as elevator buttons and restroom taps as an important possible cause of a "rapid spread" of the coronavirus in a shopping mall in Wenzhou, China.[17]

43.     Research has indicated that the coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

44.     One study, for example, found that the coronavirus remains active and dangerous on plastics for at least three days, while another reported that the coronavirus remained stable and viable for seven days on a range of common surfaces, including plastic, stainless steel, glass, and wood.[18]   Another study detected viable coronavirus samples on glass, stainless steel, and money

---

[16] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

[17] *See* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article

[18] *See* https://www.nejm.org/doi/full/10.1056/nejmc2004973;
https://www.medrxiv.org/content/10.1101/2020.05.07.20094805v1.full.pdf;
https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7

for approximately one month if left at or around room temperature.  All of these materials are used at Plaintiff's dental office.

45.    Research has also indicated that the coronavirus can spread through the air. For example, airborne viral particles are known to have spread into a facility's heating and ventilation ("HVAC") system, leading to transmission of the coronavirus from person to person.  One study found the presence of the coronavirus within the HVAC system servicing hospital ward rooms of COVID-19 patients.  This study detected SARS-CoV-2 RNA in ceiling vent openings, vent exhaust filters, and central ducts that were located more than 50 meters from the patients' rooms.[19]

46.    The Environmental Protection Agency ("EPA") has compiled several studies reflecting "epidemiological evidence suggestive of [coronavirus] transmission through aerosol."[20] Based on these and other studies, the EPA has recommended that facilities make improvements to their ventilation and HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[21]

47.    Accordingly, COVID-19 causes physical loss and damage by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe. While mitigation efforts have been undertaken and remain ongoing, COVID-19 has caused such physical loss and damage to Plaintiff's covered property, as described further below.

48.    First, respiratory droplets (*i.e.*, droplets larger than 5-10 μm) expelled from infected individuals land on, attach, and adhere to surfaces and objects. In doing so, they structurally change

---

[19] *See* https://www.researchsquare.com/article/rs-34643/v1

[20] *See* https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-andpublications

[21] *See* https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19

the property and its surface by becoming a part of that surface. This structural alteration makes physical contact with those previously safe, inert surfaces (*e.g.*, walls, handrails, furniture) unsafe.

49.     Second, when individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei (*i.e.*, those smaller than 5 μm) that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. This process alters the structural properties of air in buildings from safe and breathable to unsafe and dangerous.

50.     Fomites, droplets, droplet nuclei, and aerosols containing the coronavirus are not theoretical, intangible, or incorporeal, but rather are dangerous physical substances that have a material, tangible existence.

51.     In a study by the U.S. National Institutes of Health, researchers found that the coronavirus was detectable for up to three hours in aerosols, four hours on copper, up to 24 hours on cardboard, and up to three days on stainless steel and plastic surfaces.[22]

52.     When the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become a part of those surfaces and materials, converting the surfaces and materials to fomites.[23]   This represents a physical change in the affected surface or material, which constitutes physical loss and damage.

53.     The presence of COVID-19 within a facility causes physical loss and damage by necessitating remedial measures that include without limitation extensive cleaning and disinfecting, repairing or replacing air filtration systems, remodeling and reconfiguring physical spaces, and other measures to reduce or eliminate the presence of cases of COVID-19 and the coronavirus on-site.

---

[22] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hourssurfaces

[23] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

54.     The presence of cases of COVID-19 within a facility causes physical loss and damage by transforming the facility from property that is usable and safe for humans into a property that is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

55.     In addition, the presence of COVID-19 on property creates the imminent threat of further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the facility by touching a doorknob or gripping the arms of a dental chair, will carry those droplets on their hands and deposit them elsewhere in the facility, causing additional damage and loss.

56.     The spread and presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiff's dental practice (the "Closure Orders").

### 1.      The Minnesota Closure Orders

57.     On March 13, 2020, Minnesota Governor Tim Walz issued Emergency Executive Order 20-01, "Declaring a Peacetime Emergency and Coordinating Minnesota's Strategy to Protect Minnesotans from COVID-19."

58.     On March 16, 2020, Governor Walz issued Emergency Executive Order 20-04, which closed a variety of public accommodations.

59.     Pursuant to Executive Order 20-04, the restricted public accommodation were to remain closed from March 17, 2020 through March 27, 2020.

60.     Executive Order 20-04 made it a crime, punishable by up to 90 days in jail and/or $1,000.00 fine, to violate the Order.

61.     Also, on March 16, 2020, the American Dental Association ("ADA") recommended that "dentists nationwide postpone elective procedures in response to the spread of

the coronavirus disease, COVID-19, across the country."   The ADA determined that "[c]oncentrating on emergency dental care will allow us to care for our emergency patients and alleviate the burden that dental emergencies would place on hospital emergency departments." The American Dental Hygienists' Association ("ADHA") issued similar guidance.  The Centers for Disease Control and Prevention ("CDC") made the same recommendation to postpone elective and non-urgent visits.

62.     On March 19, 2020, Governor Walz issued Emergency Executive Order 20-09, "Directing Delay of Inpatient and Outpatient Elective Surgery and Procedural Cases during COVID-19 Peacetime Emergency."  Governor Walz cited March 17 and 18, 2020 guidance from the CDC and the Centers for Medicare and Medicaid Services ("CMS") that recommended delaying elective inpatient and outpatient dental procedures.  Governor Walz ordered that "all non-essential or elective surgeries and procedures, including non-emerg[ency] or elective dental care, that utilize PPE or ventilators must be postponed indefinitely."  The order took effect no later than the evening of March 23, 2020 and continues "for the duration of the peacetime emergency declared in Executive Order 20-01 or until this Executive Order is rescinded."

63.     Executive Order 20-09 made it a crime, punishable by up to 90 days in jail and/or $1,000.00 fine, to violate the Order.

64.     On March 25, 2020, Governor Walz issued Emergency Executive Order 20-18 extending the mandatory closure of restricted public accommodations to May 1, 2020 and further ordering that all mandates set forth in Executive Order 20-04 shall remain in effect until that date.

65.     On March 25, 2020, Governor Walz also issued Emergency Executive Order 20-20, in which he ordered "all persons currently living within the State of Minnesota … to stay at home or in their place of residence" except for certain exempted essential activities and work,

effective at 11:59 pm on March 27, 2020, and continuing through 5:00 pm on April 10, 2020 (a.k.a. Minnesota's Shelter-in-Place Order).

66.     Executive Order 20-20 provides that a violation of the Shelter-in-Place Order is punishable by up to 90 days in jail and/or a fine not to exceed $1,000.00.

67.     On April 8, 2020, Governor Walz issued Emergency Executive Order 20-33, in which he extended the Shelter-in-Place Order to 11:59 p.m. on May 3, 2020.

68.     On April 13, 2020, Governor Walz issued Emergency Executive Order 20-35, "Extending the COVID-19 Peacetime Emergency Declared in Executive Order 20-01." Governor Walz cited actions taken to date including "measures to preserve personal protective equipment" and acknowledged that "the threat remains, and our work must continue." Governor Walz ordered "[t]he peacetime emergency declared in Executive Order 20-01 is extended through May 13, 2020, until this Executive Order is rescinded…"

69.     On May 7, 2020, Governor Walz issued Emergency Executive Order 20-51, ordering that "[b]eginning on May 10, 2020 at 11:59 p.m., healthcare facilities providing procedures that utilize PPE or ventilators—whether veterinary, medical, or dental—must complete the requirements set forth in [Executive Order 20-51]." These requirements included, among others, that Plaintiff's family dental office "must implement protocols and physical measures to provide for social distancing; separate and minimize crossover between COVID-19 and non-COVID-19 areas and units to the extent possible…"

## 2.     The Impact of COVID-19 and the Closure Orders

70.     The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air. Such substances are not theoretical, intangible, or incorporeal, but rather have a material existence and are physically dangerous.

22

71.     Plaintiff's dental office is located less than two miles from Abbott Northwestern Hospital, approximately five miles from Methodist Hospital, and less than seven miles from North Memorial Health Hospital.

72.     COVID-19 has been present at these hospitals, and other area healthcare facilities, and has caused physical damage at those properties since at least March 2020.  The Closure Orders were issued, at least in part, in response to dangerous physical conditions and damage at these hospitals, and to prevent further damage at these hospitals.

73.     Individuals with COVID-19 or otherwise carrying the coronavirus have been physically present at Plaintiff's dental office.  Coronavirus-containing fomites (*i.e.,* inanimate objects), respiratory droplets, and nuclei from those individuals come into contact with, adhere to, and attach to the surfaces of the property upon which they land, including without limitation, the real property, furniture, fixtures, and personal property at the dental office.

74.     Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei physically alter property to which they adhere, attach, or come in contact including without limitation by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous.

75.     When individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. In addition, the coronavirus physically alters the air. Air inside buildings that was previously safe to breathe but can no longer safely be breathed due to coronavirus and COVID-19, has undergone a physical alteration.

76.     The presence of the coronavirus and COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at the premises.

23

Coronavirus, a physical substance, has attached and adhered to Plaintiff's property, and by doing so, altered that property. Such presence has also directly resulted in loss of functionality of that property.

77.    Persons who tested positive for COVID-19 were present at insured property on various dates during 2020. Persons who came into contact with persons diagnosed with COVID-19 were present at insured property on various dates during 2020.

78.    On information and belief, persons who were pre-symptomatic or asymptomatic and unknowingly carrying the coronavirus, including but not limited to employees, customers, and other business visitors, were present at insured property on various dates during 2020.

79.    Coronavirus droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, bathroom facilities, equipment, and supplies, and into the air and HVAC system at the dental office, causing damage and alteration to physical property and ambient air at the premises. Aerosolized coronavirus has entered the air in Plaintiff's dental office.

80.    The physical losses to Plaintiff's dental office include without limitation the rendering of its insured property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property.

81.    The physical losses to Plaintiff's dental office include without limitation the physical loss of the ability to use covered property for its primary function.

82.    The presence of COVID-19 caused "direct physical loss of or damage to" the "Covered Property" under Plaintiff's policy, and the policies of the other Class members, by: (i) causing direct physical loss of or damage to the Covered Property; (ii) denying use of and damaging the Covered Property; (iii) requiring physical repair and/or alterations to the Covered

Property; (iv) and/or by causing a necessary suspension of operations during a period of restoration.

83.     Three personnel at the dental office tested positive for COVID-19 during the period of restoration.

84.     Because of the spread or presence of COVID-19, the air in Plaintiff's property has become unsafe, necessitating repairs such as the installation of a sneeze-guard plexiglass shield at the reception to protect patients and staff.  Plaintiff's property thus has been and continues to be contaminated.

85.     In addition, the functional space in the building has been diminished by the spread or presence of COVID-19.   For example, the dental office lost its functionality as a space for elective dental care and was even required to close entirely, and the waiting room and reception area have lost their normal functionality and their space has been diminished.  Plaintiff has instituted measures to repair the physical loss or damage such as requiring patients to wait in their cars until called or texted by staff, allowing only one person in the reception area at a time, and preventing adult patients from being accompanied.

86.     Thus, there have been obvious structural alterations, changes and/or repairs made to the dental clinic so that Plaintiff can continue her dental practice after experiencing direct property damage which was caused by COVID-19 and to avoid imminent threat of further property damage.

87.     The Closure Orders prohibited access to Plaintiff's and the other Class members' Covered Property in response to dangerous physical conditions and damage at other than Covered Property resulting from a Covered Cause of Loss.

88.     As a result of the presence of COVID-19 and the Closure Orders, Plaintiff and the other Class members lost Practice Income and incurred Extra Expense.

89.     On or about March 27, 2020, Dr. Berkseth-Rojas submitted a claim to Aspen under the Policy.

90.     On March 27, 2020, less than two hours after Dr. Berkseth-Rojas submitted her claim, Aspen, through its State Administrator (USI), denied the claim.  Aspen denied that COVID-19 was a Covered Cause of Loss but did not identify any exclusion from coverage.

91.     Indeed, Aspen has, on a widescale basis with many if not all of its insureds, refused to provide Practice Income, Extra Expense, Civil Authority or Sue and Labor coverage due to COVID-19 and the resultant executive orders by civil authorities that have required the suspension of practice.

## V.    CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

93.     Plaintiff Christie Jo Berkseth-Rojas DDS seeks to represent nationwide classes defined as:

- All persons and entities that: (a) had Practice Income coverage under a property insurance policy issued by Aspen; (b) suffered a suspension of their practice related to COVID-19, at the premises covered by their Aspen property insurance policy; (c) made a claim under their property insurance policy issued by Aspen; and (d) were denied Practice Income coverage by Aspen for the suspension of practice resulting from the presence or threat of COVID-19 (the "Practice Income Breach Class").

- All persons and entities that: (a) had Civil Authority coverage under a property insurance policy issued by Aspen; (b) suffered  loss of Practice Income and/or Extra Expense caused by action of a civil authority; (c) made a claim under their property insurance policy issued by Aspen; and (d) were denied Civil Authority coverage by Aspen for the loss of Practice Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Breach Class").

26

- All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Aspen; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Aspen property insurance policy; (c) made a claim under their property insurance policy issued by Aspen; and (d) were denied Extra Expense coverage by Aspen despite their efforts to minimize the suspension of their practice caused by COVID-19 (the "Extra Expense Breach Class").

- All persons and entities that: (a) had a Sue and Labor provision under a property insurance policy issued by Aspen; (b) sought to prevent property damage caused by COVID-19 by suspending or reducing their practice, at the premises covered by their Aspen property insurance policy; (c) made a claim under their property insurance policy issued by Aspen; and (d) were denied Sue and Labor coverage by Aspen in connection with the suspension of their practice caused by COVID-19 (the "Sue and Labor Breach Class").

94.     Plaintiff Christie Jo Berkseth-Rojas DDS also seeks to represent nationwide classes

defined as:

- All persons and entities with Practice Income coverage under a property insurance policy issued by Aspen that suffered a suspension of their practice due to COVID-19 at the premises covered by the practice income coverage (the "Practice Income Declaratory Judgment Class").

- All persons and entities with Civil Authority coverage under a property insurance policy issued by Aspen that suffered loss of Practice Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

- All persons and entities with Extra Expense coverage under a property insurance policy issued by Aspen that sought to minimize the suspension of their practice in connection with COVID-19 at the premises covered by their Aspen property insurance policy (the "Extra Expense Declaratory Judgment Class").

- All persons and entities with a Sue and Labor provision under a property insurance policy issued by Aspen that sought to prevent property damage caused by COVID-19 by suspending or reducing practice operations, at the premises covered by their Aspen property insurance policy (the "Sue and Labor Declaratory Judgment Class").

95.     Each of the foregoing classes also include all persons and entities with covered losses who suffered a repudiation by Aspen or its agents, and thus did not make a claim under their policy.

96.     Excluded from each defined Class is Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members.  Plaintiff reserves the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

97.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

98.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).**  The members of each defined Class are so numerous that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believes that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiff but may be ascertained from Defendant's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

99.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

> a.  Aspen issued all-risk policies to the members of the Class in exchange for payment of premiums by the Class members;
>
> b.  whether the Class suffered a covered loss based on the common policies issued to members of the Class;

28

    c.    whether Aspen wrongfully denied all claims based on COVID-19;

    d.    whether Aspen's Practice Income coverage applies to a suspension of practice caused by COVID-19;

    e.    whether Aspen's Civil Authority coverage applies to a loss of Practice Income caused by the orders of state governors requiring the suspension of practice as a result of COVID-19;

    f.    whether Aspen's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

    g.    whether Aspen's Sue and Labor provision applies to require Aspen to pay for efforts to reduce damage caused by COVID-19;

    h.    whether Aspen has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

    i.    whether Plaintiff and the Class are entitled to an award of reasonable attorney fees, interest and costs.

100.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members are all similarly affected by Defendant's refusal to pay under its Practice Income, Civil Authority, Extra Expense, and Sue and Labor coverages.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

101.    **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members who she seeks to represent, Plaintiff has retained counsel competent

and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiff intends to prosecute this action vigorously.  The interests of the above-defined Classes will be fairly and adequately protected by Plaintiff and her counsel.

102.  **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).**  Plaintiff seeks class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Practice Income, Civil Authority, Extra Expense, and Sue and Labor coverages.  The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

103.  **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

104.  **Superiority—Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action

device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT -- PRACTICE INCOME COVERAGE
**(Claim Brought on Behalf of the Practice Income Breach Class)**

105.    Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

106.    Plaintiff brings this Count individually and on behalf of the other members of the Practice Income Breach Class.

107.    Plaintiff's Aspen insurance policy, as well as those of the other Practice Income Breach Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Practice Income Breach Class members' losses for claims covered by the policy.

108.    In the Income Coverage Form, Aspen agreed to pay for its insureds' actual loss of Practice Income sustained due to the necessary suspension of practice during the "period of restoration" caused by direct physical damage, subject to a Valued Daily Limit. Aspen agreed to "pay for loss of practice income that occurs within 12 consecutive months after the date of direct physical damage."

109.    "Practice Income" means net income (or loss) before tax that a policyholder would have earned and "continuing normal operating expenses, including payroll."

110.    COVID-19 caused direct physical loss and damage to Plaintiff's and the other Practice Income Breach Class members' Covered Properties, requiring suspension of practice at their Covered Properties.   Losses caused by COVID-19 thus triggered the Practice Income

provision of Plaintiff's and the other Practice Income Breach Class members' Aspen insurance policies.

111.    Plaintiff and the other Practice Income Breach Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

112.    By denying coverage for any Practice Income losses incurred by Plaintiff and the other Practice Income Breach Class members in connection with the COVID-19 pandemic, Aspen has breached its coverage obligations under the Policies.

113.    As a result of Aspen's breaches of the Policies, Plaintiff and the other Practice Income Breach Class members have sustained substantial damages for which Aspen is liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the Civil Authority Breach Class)**

114.    Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

115.    Plaintiff brings this Count individually and on behalf of the other members of the Civil Authority Breach Class.

116.    Plaintiff's Aspen insurance policy, as well as those of the other Civil Authority Breach Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Civil Authority Breach Class members' losses for claims covered by the policy.

117.    Aspen promised to pay "the actual loss of practice income" that a policyholder sustains "caused by action of civil authority that prohibits access to" the Covered Property "due to

the direct physical damage to property," other than at the Covered Property, "caused by or resulting from any covered cause of loss."

118.   The Closure Orders triggered the Civil Authority provision under Plaintiff's and the other members of the Civil Authority Breach Class's Aspen insurance policies.  COVID-19 caused direct physical loss or damage to property other than Covered Property in the same manner described above that it caused direct physical loss or damage to Covered Property. The civil authority orders were actions taken in response to the dangerous physical conditions resulting from the direct physical damage to such properties. And, the civil authority orders prohibited access to an immediately surrounding area that included the Covered Property.

119.   Plaintiff and the other members of the Civil Authority Breach Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

120.   By denying coverage for any practice losses incurred by Plaintiff and other members of the Civil Authority Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Aspen has breached its coverage obligations under the Policies.  As a result of Aspen's breaches of the Policies, Plaintiff and the other members of the Civil Authority Breach Class have sustained substantial damages for which Aspen is liable, in an amount to be established at trial.

**COUNT III**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Extra Expense Breach Class)**

121.   Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

122.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Breach Class.

123.    Plaintiff's Aspen insurance policy, as well as those of the other Extra Expense Breach Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Extra Expense Breach Class members' losses for claims covered by the policy.

124.    In the Income Coverage Form, Aspen also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" "due to damage by a covered cause of loss" to the Covered Property.

125.    "Extra Expense" means expenses necessarily incurred by a policyholder "during the period of restoration to continue normal services and operations."

126.    Due to COVID-19 and the Closure Orders, Plaintiff and the other members of the Extra Expense Breach Class incurred Extra Expense at Covered Property

127.    Plaintiff and the other members of the Extra Expense Breach Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

128.    By denying coverage for any business losses incurred by Plaintiff and the other members of the Extra Expense Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Aspen has breached its coverage obligations under the Policies.

129.    As a result of Aspen's breaches of the Policies, Plaintiff and the other members of the Extra Expense Breach Class have sustained substantial damages for which Aspen is liable, in an amount to be established at trial.

## COUNT IV
## BREACH OF CONTRACT – SUE AND LABOR COVERAGE
### (Claim Brought on Behalf of the Sue and Labor Breach Class)

130.   Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

131.   Plaintiff brings this Count individually and on behalf of the other members of the Sue and Labor Breach Class.

132.   Plaintiff's Aspen insurance policy, as well as those of the other Sue and Labor Breach Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Sue and Labor Breach Class members' losses for claims covered by the policy.

133.   In the Income Coverage Form, Aspen agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

134.   In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiff and other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property.

135.   Plaintiff and the other members of the Sue and Labor Breach Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

136.   By denying coverage for any Sue and Labor expenses incurred by Plaintiff and the other members of the Sue and Labor Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Aspen has breached its coverage obligations under the Policies.

137.    As a result of Aspen's breaches of the Policies, Plaintiff and the other members of the Sue and Labor Breach Class have sustained substantial damages for which Aspen is liable, in an amount to be established at trial.

**COUNT V**
**DECLARATORY JUDGMENT – PRACTICE INCOME COVERAGE**
**(Claim Brought on Behalf of the Practice Income Declaratory Judgment Class)**

138.    Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

139.    Plaintiff brings this Count individually and on behalf of the other members of the Practice Income Declaratory Judgment Class.

140.    Plaintiff's Aspen insurance policy, as well as those of the other Practice Income Declaratory Judgment Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Practice Income Declaratory Judgment Class members' losses for claims covered by the Policy.

141.    Plaintiff and the other Practice Income Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and other members of the Practice Income Declaratory Judgment Class are entitled.

142.    Aspen has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

143.    An actual case or controversy exists regarding Plaintiff's and the other Practice Income Declaratory Judgment Class members' rights and Aspen's obligations under the Policies

to reimburse them for the full amount of Practice Income losses incurred by Plaintiff and the other

Practice Income Declaratory Judgment Class members in connection with suspension of their

practices stemming from the COVID-19 pandemic.

144.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Practice Income Declaratory

Judgment Class members seek a declaratory judgment from this Court declaring the following:

     i.     Plaintiff's and the other Practice Income Declaratory Judgment Class members'
Practice Income losses incurred in connection with the Closure Orders and the
necessary interruption of their practices stemming from the COVID-19 pandemic
are insured losses under their Policies; and

    ii.     Aspen is obligated to pay Plaintiff and the other Practice Income Declaratory
Judgment Class members for the full Valued Daily Limit amount of the Practice
Income losses incurred and to be incurred in connection with the Closure Orders
during the period of restoration and the necessary interruption of their practices
stemming from the COVID-19 pandemic.

**COUNT VI**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the Civil Authority Declaratory Judgment Class)**

145.    Plaintiff Christie Jo Berkseth-Rojas repeats and realleges Paragraphs 1-71 as if fully

set forth herein.

146.    Plaintiff brings this Count individually and on behalf of the other members of the

Civil Authority Declaratory Judgment Class.

147.    Plaintiff's Aspen insurance policy, as well as those of the other Civil Authority

Declaratory Judgment Class members, are contracts under which Aspen was paid premiums in

exchange for its promise to pay Plaintiff's and the other Civil Authority Declaratory Judgment

Class members' losses for claims covered by the Policy.

148.    Plaintiff and the other Civil Authority Declaratory Judgment Class members have

complied with all applicable provisions of the Policies and/or those provisions have been waived

by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance

coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and other members of the Civil Authority Declaratory Judgment Class members are entitled.

149.    Aspen has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

150.    An actual case or controversy exists regarding Plaintiff and the other Civil Authority Declaratory Judgment Class members' rights and Aspen's obligations under the Policies to reimburse Plaintiff and the other Civil Authority Declaratory Judgment Class members for the full amount of covered Civil Authority losses incurred by Plaintiff and the other Civil Authority Declaratory Judgment Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

151.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

i.    Plaintiff's and the other Civil Authority Declaratory Judgment Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their practices stemming from the COVID-19 pandemic are insured losses under their Policies; and

ii.    Aspen is obligated to pay Plaintiff and the other Civil Authority Declaratory Judgment Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their practices stemming from the COVID-19 pandemic

**COUNT VII**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Extra Expense Declaratory Judgment Class)**

152.    Plaintiff Christie Jo Berkseth-Rojas DDS repeats and realleges Paragraphs 1-71 as if fully set forth herein.

38

153.    Plaintiff brings this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

154.    Plaintiff's Aspen insurance policy, as well as those of the other Extra Expense Declaratory Judgment Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Extra Expense Declaratory Judgment Class members' losses for claims covered by the Policy.

155.    Plaintiff and the other Extra Expense Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and the other members of the Extra Expense Declaratory Judgment Class are entitled.

156.    Aspen has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

157.    An actual case or controversy exists regarding Plaintiff's and the other Extra Expense Declaratory Judgment Class members' rights and Aspen's obligations under the Policies to reimburse Plaintiff and the other Extra Expense Declaratory Judgment Class members for the full amount of Extra Expense losses incurred by them in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

158.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Extra Expense Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

      i.    Plaintiff's and the other Extra Expense Declaratory Judgment Class members' Extra Expense losses incurred in connection with the Closure Orders and the

necessary interruption of their practices stemming from the COVID-19 pandemic are insured losses under their Policies; and

ii.    Aspen is obligated to pay Plaintiff and the other Extra Expense Declaratory Judgment Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their practices stemming from the COVID-19 pandemic.

**COUNT VIII**
**DECLARATORY JUDGMENT – SUE AND LABOR COVERAGE**
**(Claim Brought on Behalf of the Sue and Labor Declaratory Judgment Class)**

159.    Plaintiff Christie Jo Berkseth-Rojas repeats and realleges Paragraphs 1-71 as if fully set forth herein.

160.    Plaintiff brings this Count individually and on behalf of the other members of the Sue and Labor Declaratory Judgment Class.

161.    Plaintiff's Aspen insurance policy, as well as those of the other Sue and Labor Declaratory Judgment Class members, are contracts under which Aspen was paid premiums in exchange for its promise to pay Plaintiff's and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property.

162.    Plaintiff and the other Sue and Labor Declaratory Judgment Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Aspen or Aspen is estopped from asserting them, and yet Aspen has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and the other members of the Sue and Labor Declaratory Judgment Class are entitled.

163.    Aspen has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

40

164.    An actual case or controversy exists regarding Plaintiff's and the other Sue and Labor Declaratory Judgment Class members' rights and Aspen's obligations under the Policies to reimburse Plaintiff and the other Sue and Labor Declaratory Judgment Class members for the full amount Plaintiff and the other members of the Sue and Labor Declaratory Judgment Class reasonably incurred to protect Covered Property from further damage by COVID-19.

165.    Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Sue and Labor Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

> b.   Plaintiff's and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their Policies; and
>
> c.   Aspen is obligated to pay Plaintiff and the other Sue and Labor Declaratory Judgment Class members for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

## VII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

a.    Entering an order certifying the proposed nationwide Classes, as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the Classes;

b.    Entering judgment on Counts I-IV in favor of Plaintiff and the members of the Practice Income Breach Class, the Civil Authority Breach Class, the Extra Expense Breach Class, and the Sue and Labor Breach Class; and awarding damages for breach of contract in an amount to be determined at trial;

c.    Entering declaratory judgments on Counts V-VIII in favor of Plaintiff and the members of the Practice Income Declaratory Judgment Class, the Civil Authority Declaratory

Judgment Class, the Extra Expense Declaratory Judgment Class, and the Sue and Labor Declaratory Judgment Class as follows;

      i.    Practice Income, Civil Authority, Extra Expense, and Sue and Labor losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

     ii.    Aspen is obligated to pay for the full amount of the Practice Income (subject to the Valued Daily Limit), Civil Authority, Extra Expense, and Sue and Labor losses incurred and to be incurred related to COVID-19, the Closure Orders and the necessary interruption of their practices stemming from the COVID-19 pandemic;

d.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

e.    Ordering Defendant to pay attorneys' fees and costs of suit; and

f.    Ordering such other and further relief as may be just and proper.

## VIII.  JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: February 9, 2021

Respectfully submitted,

*/s/ W. Mark Lanier*
Mark Lanier
Alex Brown
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com

Adam J. Levitt
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com

Mark A. DiCello*
Kenneth P. Abbarno*
Mark Abramowitz*
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone:  440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

Adam Reed
Reed Carter, PLLC
8390 Lyndon B. Johnson Fwy
Suite 570
Dallas Texas  75243
Telephone: 214-540-7730
adam@reedcarterlaw.com


***Counsel for Plaintiff
and the Proposed Classes***


\* Applications for admission *pro hac vice* to be filed